

**IT IS SO ORDERED.**
**Signed September 25, 2013**

_Arthur S. Weissbrodt_

**Arthur S. Weissbrodt**
**U.S. Bankruptcy**

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re | ] | Case No. 08-57266-ASW |
| | ] | |
| OSCAR J. MARTINEZ, | ] | Chapter 7 |
| | ] | |
| Debtor. | ] | |
| _____ | ] | |
| | ] | |
| ANDY SIU, | ] | Adv. Proc. No. 09-5063 |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| vs. | ] | |
| | ] | |
| OSCAR J. MARTINEZ, | ] | |
| | ] | |
| Defendant. | ] | |
| _____ | ] | |

**MEMORANDUM DECISION AND ORDER**

     This matter came before the Court for a trial on Plaintiff
Andy Siu's adversary claims against Defendant and Debtor Oscar J.
Martinez.  At trial, Mr. Siu was represented by attorney Michael
Brooks Carroll.  Mr. Martinez appeared <u>pro se</u>.[1]

_____

     [1] Mr. Martinez was unrepresented in this adversary proceeding,
but was represented by attorney Stanley Zlotoff in the main
bankruptcy case.

After considering the evidence presented at trial, along with the oral and written arguments of the parties, the Court finds and concludes that Mr. Martinez must be denied a discharge under 11 U.S.C. § 727(a)(2)(A) based upon Mr. Martinez's transfer of substantial funds to family members within one year immediately prior to the filing of the bankruptcy petition, with an intent to hinder and delay creditors. As a result, all of the nondischargeability claims under 11 U.S.C. § 523(a) are moot, and the Court does not reach these claims. See Ng v. Adler (In re Adler), 494 B.R. 43, 56 (Bankr. E.D.N.Y. 2013); Rasmussen v. Unruh (In re Unruh), 278 B.R. 796, 806 (Bankr. D. Minn. 2002); Everwed Co. v. Ayers (In re Ayers), 25 B.R. 762, 764 (Bankr. Tenn. 1982) (a denial of discharge renders nondischargeability questions moot); Taylor v. Lineberry (In re Lineberry), 55 B.R. 510, 511 (Bankr. W.D. Ky. 1985) (explaining that a denial of discharge under § 727 renders a § 523(a) challenge moot). Mr. Siu has asserted no other causes of action in this proceeding.

**I. Background**

Plaintiff Andy Siu commenced this proceeding against Defendant Oscar J. Martinez by filing an adversary complaint ("the Complaint") on March 9, 2009, asserting five separate causes of action. Claims 1 and 5 seek to deny Mr. Martinez a bankruptcy discharge under 11 U.S.C. §§ 105 and 727(a). Claims 2 through 4 seek to deny Mr. Martinez a discharge as to Mr. Martinez's debts owed to Mr. Siu under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). Mr. Martinez filed an answer denying all claims.

According to the Complaint, the starting point for Mr. Siu's claims was October 1999, when Mr. Martinez arranged for Mr. Siu to purchase a house located at 755 Lisbon Street in San Francisco, California (hereafter, "the Property"). In the transaction, Mr. Martinez acted as Mr. Siu's real estate broker, mortgage loan broker, construction loan broker, and contractor, and also acted as the real estate broker for the seller.

Mr. Siu alleges that Mr. Martinez engaged in the following acts which should have the effect of denying Mr. Martinez a bankruptcy discharge altogether:

(1) Mr. Martinez has engaged in a pattern of deceiving prospective homeowners into buying properties and making payments for services which Mr. Martinez never intended to perform, then filing for bankruptcy at least five separate times to avoid being held responsible;

(2) Mr. Martinez intended to hinder, delay, or defraud creditors by transferring, removing, destroying, mutilating, or concealing property within one year before filing Case No. 08-57266, by failing to disclose that Mr. Martinez was provided rent free office space and other business resources, and by transferring assets to family members and close business associates, allowing such persons to use Mr. Martinez's real estate broker and contractor licenses, then failing to disclose the consideration Mr. Martinez received for the use of Mr. Martinez's licenses; and

(3) In the same respects, Mr. Martinez made a false oath or account.

Mr. Siu also alleges that Mr. Martinez's debts to Mr. Siu are nondischargeable for fraud, breach of fiduciary duties, and willful and malicious conduct. These nondischargeability claims are premised upon allegations that Mr. Martinez had a conflict of interest and violated California law, as follows:

(1) Mr. Martinez received a deposit for the construction work in the amount of $4,700.00, which exceeded the maximum allowed deposit of $1,000.00;

(2) Mr. Martinez insisted upon prepayment for the work, which was illegal "front end loading" of the payment;

(3) Mr. Martinez demanded payment of the funds before a home improvement construction contract was executed;

(4) Mr. Martinez commenced work before a contract was executed;

(5) Mr. Martinez failed to provide Mr. Siu with commencement and completion dates or a schedule of payments;

(6) The contract did not provide a statement regarding lien releases, or provisions addressing extra work or change-orders;

(7) Mr. Martinez failed to disclose to Mr. Siu that Mr. Martinez received an additional $10,000.00 out of escrow from the seller to perform painting and carpeting work, for which Mr. Siu separately paid, but which work Mr. Martinez never performed;

(8) Mr. Martinez induced Mr. Siu to rely on Mr. Martinez's representations that if Mr. Siu purchased the Property, Mr. Martinez would perform the necessary contractor work

to make the Property livable, when Mr. Martinez never intended to perform the work and instead intended to convert the funds to Mr. Martinez's personal use;

(9) Mr. Martinez induced Mr. Siu to execute a promissory note for $14,046.33 payable to Mr. Martinez's business entity and tried to induce Mr. Siu to execute a deed of trust, but failed to give the notices required by California law for soliciting a promissory note and deed of trust;

(10) Mr. Martinez willfully breached the warranty[2] in the contract to perform work in compliance with industry standards of good workmanship;

(11) Mr. Martinez abandoned the work in an incomplete and unsafe condition and before earning the $55,531.00 paid to Mr. Martinez to perform the work, without providing a cancellation notice;

(12) Mr. Martinez failed to obtain required building permits; and

(13) Mr. Martinez misrepresented Mr. Martinez's status as a licensed contractor, when Mr. Martinez's license had expired and Mr. Martinez's license bond had been cancelled.

With regard to the claims under § 523(a), in addition to seeking determinations of nondischargeability, the Complaint also seeks recovery of monetary damages, the costs of suit, and attorney's fees. Mr. Siu's Trial Brief filed March 1, 2011, explains that Mr. Siu seeks to recover the following: $55,531.00 in

---

[2] The Complaint alleges a breach of warranty, but it is unclear from the Complaint whether the warranty was express or implied.

out-of-pocket losses for money paid to Mr. Martinez to perform the construction work; $93,814.74 in consequential damages for money paid to remediate the defective work; $151,742.72 for a state court default judgment obtained against Mr. Martinez's partnership, M&M Construction Company (hereafter "M&M Construction"); $39,372.96 in attorney's fees incurred attempting to enforce the judgment against M&M Construction; at least $200,000.00 in damages for Mr. Martinez's breach of fiduciary duty; an unstated amount of punitive damages; attorney's fees incurred in this action; and costs of suit. There is no right to a jury trial on these issues, because they are asserted in a nondischargeability complaint. See Locke v. United States Trustee (In re Locke), 205 B.R. 592, 600 (B.A.P. 9th Cir. 1996) (discussing Schieber v. Hooper (In re Hooper), 112 B.R. 1009 (B.A.P. 9th Cir. 1990).

Mr. Siu's request for damages pertaining to the state court action and default judgment against M&M Construction raises an issue which neither side has addressed. Originally, the state court action against M&M Construction was also against Mr. Martinez, but the action was stayed as to Mr. Martinez because of a bankruptcy stay arising in Case No. 03-57234-ASW. If Mr. Siu is contending that the judgment against M&M Construction should now be treated as a judgment collectible from Mr. Martinez or from property of Mr. Martinez's estate, this could violate the automatic stay that was in effect in Case No. 03-57234-ASW when the action against M&M Construction moved forward. See Schwartz v. United States (In re Schwarz), 954 F.2d 569, 571 (9th Cir. 1992). The wisdom of Mr. Siu having proceeded against M&M Construction in the face of a bankruptcy stay protecting its partner, Mr. Martinez, is

1   also questionable.  This is because, under certain circumstances,

2   it can be inappropriate to continue with an action against a non-

3   debtor co-defendant while the action against the debtor is stayed.

4   See Chugach Timber Corp. v. Northern Stevedoring & Handling Corp.

5   (In re Chugach Forest Products, Inc.), 23 F.3d 241, 247 n.6 (9th

6   Cir. 1994) (describing the "unusual circumstances doctrine" in

7   which 11 U.S.C. § 105 is used to enjoin an action against a non-

8   debtor whose interests are not truly separable from the debtor's

9   interests); A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999

10  (4th Cir. 1986).  However, Mr. Martinez could have asked the

11  Bankruptcy Court to enjoin the action against M&M Construction, but

12  Mr. Martinez never sought any such injunction.  Regardless, the

13  validity and collectibility of the default judgment against M&M

14  Construction or its other partner(s) is not at issue in this

15  proceeding.

16

17  **II. Mr. Martinez's Invocation of Fifth Amendment**

18       At trial, Mr. Martinez invoked the protection of the Fifth

19  Amendment to the United States Constitution in response to several

20  questions asked by Mr. Siu's counsel.  The Fifth Amendment

21  specifically states that no person shall be "compelled in any

22  criminal case to be a witness against himself[.]"  Colloquially,

23  this right is referred to as the privilege against self-

24  incrimination.

25       Notwithstanding the Fifth Amendment's language referencing

26  compulsion to testify in a "criminal case," the privilege against

27  self-incrimination can be invoked in a civil case.  See Nationwide

28  Life Ins. Co. v. Richards, 541 F.3d 903, 911 (9th Cir. 2008);

S.E.C. v. Colello, 139 F.3d 674, 677 (9th Cir. 1998). The Bankruptcy Code, 11 U.S.C. § 344, contemplates that this privilege can also be invoked in bankruptcy cases and adversary proceedings. See 11 U.S.C. § 344; 11 U.S.C. § 727(a)(6); see also McCormick v. Banc One Leasing Corp. (In re McCormick), 49 F.3d 1524, 1526 (11th Cir. 1995) ("There is no doubt that the Fifth Amendment privilege extends to bankruptcy proceedings." ); Martin-Trigona v. Belford (In re Martin-Trigona), 732 F.2d 170, 175 (2d Cir. 1984). After considering the parties' respective arguments and authorities, this Court ruled at a hearing held April 13, 2012, that Mr. Martinez could invoke the privilege in this adversary proceeding, and that Mr. Martinez had not waived the right to do so.[3]

When the privilege is invoked in a non-criminal case, the presiding court may, in its discretion, draw an adverse inference from the assertion. Nationwide Life Ins. Co., 541 F.3d at 911. Whether an adverse inference should be drawn depends upon the facts of the case. Id. at 911-12. No adverse inference may be drawn, however, "unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information." Id. at 912 (internal quotes and cites omitted). The Court must also "determine 'whether the value of presenting [the] evidence [is] substantially outweighed by the danger of unfair

---

[3] A witness who invokes the privilege against self-incrimination can be granted immunity under 11 U.S.C. § 344, in which circumstance the witness can be compelled to testify. However, neither Mr. Siu nor Mr. Martinez wished to request a grant of immunity from the United States Attorney. See Turner v. Wlodarski (In re Minton Group, Inc.), 43 B.R. 705, 708-09 (Bankr. N.Y. 1984) (addressing procedure for obtaining a grant of immunity). Mr. Siu said that he did not want to request immunity for Mr. Martinez because it would delay the trial of this matter; Mr. Martinez did not offer a reason.

prejudice' to the party asserting the privilege." Id. (cites omitted). In addition, the Court is not permitted to draw an adverse inference if there is "independent evidence of the fact about which the party refuses to testify." Id. (cite omitted).

When the privilege is invoked in a civil case, it is on a question-by-question basis. See Doe ex rel. Rudy-Glanzer v. Glanzer, 232 F.3d 1258, 1265 (9th Cir. 2000). This means that "the assertion of the privilege necessarily attaches only to the question being asked and the information sought by that particular question[.]" Id. However, the Ninth Circuit recently determined that, in order to protect the integrity and truth-seeking functions of the judicial process, a court may also strike testimony by a witness who has asserted the Fifth Amendment privilege to avoid answering relevant questions which would subject the testimony to scrutiny. United States v. $133,420.00 in U.S. Currency, 672 F.3d 629, 641 (9th Cir. 2012) (civil forfeiture case).

At trial, Mr. Martinez invoked the Fifth Amendment as to almost all questions presented to him by Mr. Carroll. The Court has scoured the record and concludes that it is appropriate to draw negative inferences against Mr. Martinez with respect to each and every question for which he invoked the privilege, because there is no independent evidence in the record to contradict the negative inferences, and because Mr. Siu has demonstrated a substantial need for the information with no less burdensome way to obtain the information.

The questions presented by Mr. Carroll to Mr. Martinez sought information within Mr. Martinez's personal knowledge, for instance, the identity of Mr. Martinez's family members and the business

interactions and transfers of funds between Mr. Martinez and those family members. As discussed more fully _infra_, Mr. Martinez transferred thousands of dollars to family members in the year immediately prior to filing for bankruptcy, but these transfers were omitted from the Statement of Financial Affairs, and Mr. Martinez denied making any such transfers when questioned under oath at the 341 Meeting of Creditors. Mr. Martinez's intent with regard to those undisclosed transfers is directly at issue with regard to Mr. Siu's § 727(a)(2)(A) claim. The Court must draw adverse inferences from Mr. Martinez's refusal to answer questions about these transfers and his intent in making the transfers, because no other witnesses were available to testify on this issue.[4] However, the Court will not strike any of Mr. Martinez's testimony, of which there is very little given that Mr. Martinez elected not to present any evidence of his own at trial.

## III. Findings of Fact

### A. Mr. Martinez's Business Interests

Mr. Martinez filed a petition under Chapter 7 of the Bankruptcy Code on December 15, 2008. According to the Statement of Financial Affairs submitted with the petition -- of which this

---

[4] Mr. Siu's counsel, Mr. Carroll, reported to the Court that counsel had attempted to serve subpoenas on Mr. Martinez's family members to shed more light on this issue, but Mr. Carroll had been unable to serve the subpoenas successfully. Mr. Carroll did not explain whether counsel had requested addresses for Mr. Martinez's family members during discovery or at trial, but Mr. Carroll did not request specific relief from the Court in this regard. Instead, counsel orally asked the Court on February 29, 2012 to direct that Mr. Martinez make the family members -- as Mr. Martinez's agents -- available to testify. For this request, Mr. Carroll provided no legal authority and did not follow up with any motion. The Court did not grant the request.

Court takes judicial notice -- Mr. Martinez's business interests[5] included four companies: Century Medallion Los Gatos (hereafter, "Century Medallion"), Los Gatos Custom Construction (hereafter, "LGCC"), Saratoga Mortgage Group, Inc. (also referred to as "SMG"), and M&M Construction. Schedule B also lists Century Medallion and LGCC as Mr. Martinez's sole proprietorships.

The Statement of Financial Affairs lists the gross revenue from Century Medallion and LGCC, as follows: $50,723.00 in 2008 from Century Medallion; $158,614.00 in 2007 from Century Medallion; $58,410.00 in 2006 from Century Medallion; $121,268.00 in 2007 from LGCC; and $52,639.00 in 2006 from LGCC.[6] No gross revenue was listed for any other business, such as SMG. When asked by Mr. Carroll whether the Statement of Financial Affairs accurately represented the income received by Century Medallion and LGCC, Mr. Martinez invoked the Fifth Amendment.

The evidence admitted at trial shed further light on the connection between Mr. Martinez and these -- as well as other -- businesses. Information from the State of California Department of Real Estate states that as of September 11, 2006, Mr. Martinez was

---

[5] Question 18 on the Statement of Financial Affairs required Mr. Martinez to list "all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time within six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within six years immediately preceding the commencement of this case."

[6] Question 1 on the Statement of Financial Affairs only requests this information for the calendar year of the petition up to the date of the petition (January 1 to December 15, 2008), and the two years preceding the calendar year of the petition (all of 2006 and 2007).

a broker with a main office at 15814 Winchester Blvd. in Los Gatos, California. The same information shows that Mr. Martinez was doing business as Century Medallion-Los Gatos, Century Medallion-Saratoga, Century Realtors of Los Gatos, International Estates, International Estates & Investments, and Saratoga Mortgage Group. Another document of the same type states that as of August 24, 2003, SMG was also located at the Winchester address, with Mr. Martinez as its designated officer.

There was also evidence that Mr. Martinez held business licenses for LGCC (license number 773947) as well as for another entity known as OJM Developers (license number 804979). A letter dated January 30, 2002, to OJM Developers congratulated OJM Developers on its eligibility for a contractor's license. That letter listed OJM Developers's address as 15814 Winchester Blvd. Another document entitled Exemption from Workers' Compensation, dated October 25, 2001, was signed by Mr. Martinez in his role as "owner, partner, or officer" of OJM Developers. Similarly, another document entitled Exemption from Workers' Compensation, dated January 12, 2000, was signed by Mr. Martinez in his role as "owner, partner, or officer" of LGCC. These documents provide evidence of Mr. Martinez's connection to these companies.

**B. Pre- and Post-Petition Asset Transfers**

In the Statement of Financial Affairs filed with the bankruptcy petition, which Mr. Martinez signed under penalty of perjury on December 15, 2008, Mr. Martinez represented that no transfers or payments were made to or for the benefit of creditors who are or were insiders within the year immediately preceding the

filing of the bankruptcy petition.  Mr. Martinez also represented that no gifts were made to family members during that same time period.[7]  At the 341 Meeting of Creditors held January 9, 2009, when the Chapter 7 Trustee, Mohamed Poonja, asked Mr. Martinez -- who was under oath -- whether Mr. Martinez had transferred any assets of any kind to anyone in the last four years, Mr. Martinez responded, "No."  However, the evidence shows that in the 12-month period prior to the filing of the petition, Mr. Martinez's sole proprietorship, Century Medallion, transferred substantial funds to family members, including to another business entity known as the 7&8 Partnership.

According to a Statement of Amendment/Cancellation filed with the California Secretary of State, as of February 13, 2003, the partners for the 7&8 Partnership were Gloria A. Martinez, Alina Martinez, Anthony Martinez, and Marcus Martinez, all located at 15814 Winchester Blvd. in Los Gatos, California.[8]  Gloria A.

---

[7] Question 3(c) on the Statement of Financial Affairs required Mr. Martinez to list "all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders."  The term "insiders" includes all relatives of a debtor.  11 U.S.C. § 101(31)(A)(I).  As to this question, Mr. Martinez marked "none" and listed no payments to any family members.
   Question 7 on the Statement of Financial Affairs required Mr. Martinez to list "all gifts or charitable contributions made within one year immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient."  Again, Mr. Martinez marked "none" and listed no gifts to family members.

[8] At trial, Mr. Martinez objected to the relevance of the Statement of Amendment/Cancellation, and the Court took that objection under advisement.  The Court now rules that the document is relevant to demonstrate that Mr. Martinez transferred funds to an entity operated by Mr. Martinez's children through his sole
(continued...)

Martinez, Alina Martinez, Anthony Martinez, and Marcus Martinez are Mr. Martinez's children.[9]  Checks were written to the 7&8 Partnership using various permutations of its name -- 7&8 Partnership, 7&8 General Partnership, 7&8 Partnership Winchester, 7&8 General Partnership Winchester, 7&8 Partnership/Miller, 7&8 Winchester, and 7&8 Reno -- but the Court is persuaded and finds that all of these names were used by the single entity, 7&8 Partnership.  It is unclear what the purpose of these checks was, although there was some evidence that Mr. Martinez paid rent to 7&8 Partnership for the space Mr. Martinez was leasing to operate his businesses at 15814 Winchester Blvd.  According to Schedule J filed with the petition, the rent to 7&8 had recently been reduced to $2,000.00 per month.[10]

There was also no evidence that these specific payments were made to compensate Mr. Martinez's children for any work the children may have performed on behalf of Mr. Martinez or any of his businesses.  There was some evidence that Mr. Martinez employed one or more of his children to work for Mr. Martinez.  According to Mr. Siu, Mr. Martinez's daughter, Ann Martinez, worked for Century

---

[8](...continued)
proprietorship, Century Medallion.

[9] At trial, Mr. Carroll asked Mr. Martinez whether Gloria A. Martinez, Alina Martinez, Anthony Martinez, and Marcus Martinez were his children.  As to these questions, Mr. Martinez invoked the Fifth Amendment.  Therefore, the Court infers that these individuals are, indeed, Mr. Martinez's children.

[10] Rent of $2,000.00 per month appears to have been at or near the market rate.  One of the exhibits admitted at trial shows that Mr. Martinez advertised office space for lease at 15814 Winchester at some point during 2012.  According to the advertisement, the 661 square foot space was offered at $3 per square foot per month, or slightly less than $2,000.00 per month.

Medallion (possibly also with SMG) and helped Mr. Siu purchase the property and secure a loan to buy the Property.  As for other family members, in the context of a discussion between Mr. Carroll, Mr. Martinez, and the Court concerning Mr. Carroll's inability to subpoena members of Mr. Martinez's family as witnesses, Mr. Carroll made a general representation to the Court that members of Mr. Martinez's family were employees of Mr. Martinez and could be forced to appear and give testimony as Mr. Martinez's agents. Unsworn, Mr. Martinez indicated that his wife, Gloria Martinez, had worked for him, and that his daughter Alina had occasionally worked for him.  However, there was no evidence offered during the trial which demonstrated an employment relationship between Mr. Martinez or Mr. Martinez's entities and his children apart from Ann Martinez, or that any payments to the children were for work performed for Mr. Martinez or his businesses.  When questioned about the purpose of the payments to his children, Mr. Martinez invoked the Fifth Amendment.

Between December 15, 2007 and December 15, 2008 -- the 12-month period immediately preceding the filing of Mr. Martinez's bankruptcy petition -- representatives of Century Medallion of Los Gatos wrote at least four checks to the 7&8 Partnership totaling $39,750.00.[11]  In that same 12-month period, a check to Mr. Martinez's son Anthony Martinez was written from Century Medallion of Los Gatos in the amount of $4,500.00.  After the petition was filed, at least nine additional checks from Century Medallion of Los Gatos were written to the 7&8 Partnership in an amount totaling

---

[11] During all of 2007 -- not just the 12-month reach back period -- Century Medallion wrote checks to the 7&8 Partnership totaling at least $135,081.00.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

at least $20,082. Another check to Anthony Martinez in the amount of $2,400.00 was written by Century Medallion of Los Gatos after the petition was filed.

Several checks were also written from Century Medallion to Gloria Martinez, but it was unclear from the record whether the checks were written to Mr. Martinez's daughter or to his wife, who share the same first name. In addition, several checks from Century Medallion were made out to Oscar Martinez, but there was evidence that Mr. Martinez also has a son named Oscar, so it was unclear to whom the checks were made.

In total, Mr. Martinez's sole proprietorship, Century Medallion, transferred at least $44,250.00 to family members in the year prior to the filing of the petition, and transferred at least an additional $22,482.00 to family members after the petition was filed. None of these transfers were mentioned in the Statement of Financial Affairs, which explicitly required Mr. Martinez to provide information about transfers of this type.

There were also pre-petition transfers from SMG to, or benefitting, the 7&8 Partnership. On January 17, 2008, a check from SMG to "cash" was made in the amount of $3,583.33. According to the memorandum on the check, the purpose of the check was to cover the "Herzer/Lucot Pmt" -- a recurring, monthly payment normally made by the 7&8 Partnership to Herzer Financial Services. There was also a check from SMG dated April 24, 2008, payable to the 7&8 Partnership in the amount of $13,000.00.

The 7&8 Partnership was not listed as a creditor in Mr. Martinez's bankruptcy schedules or on the creditor matrix. In addition, Mr. Martinez listed no executory contracts or unexpired

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

leases in the schedules, such as any lease between Mr. Martinez and the 7&8 Partnership for Mr. Martinez's office space. The Statement of Financial Affairs also excludes reference to SMG's revenue, and completely omits reference to OJM.

At trial, Mr. Carroll asked several questions of Mr. Martinez concerning transfers of money to the 7&8 Partnership and to Mr. Martinez's children, as well as Mr. Martinez's relationship to the 7&8 Partnership. As to every question, Mr. Martinez invoked the Fifth Amendment. These questions included:

> Q. Mr. Martinez, have you ever transferred anything of value to 7&8 Partnership or to any person who was a partner of 7&8 Partnership other than a payment to 7&8 Partnership as your landlord for the premises you are allegedly renting at the Winchester building?

> Q. Have you ever made any loans to 7&8 Partnership during the time that you were a debtor in any bankruptcy proceeding?

> Q. Have you ever withdrawn any money from a bank account maintained in the name of 7&8 Partnership [while a debtor in a bankruptcy proceeding]?

> Q. Mr. Martinez, have you ever caused any company that you control, such as Century Medallion or [LGCC], to transfer anything of value to 7&8 Partnership or to any person who was a partner of 7&8 Partnership, other than a rent payment for your premises during the time when you were a debtor in any bankruptcy proceeding?

> Q. Mr. Martinez, did you ever make any payments to 7&8 Partnership, calling them rent payments when, in fact, those payments were not truly rent?

> Q. Mr. Martinez, did you have access to the 7&8 Partnership bank accounts?

> Q. Did you have the ability to go to the Bank of America where 7&8 Partnership maintained its bank accounts and withdraw cash?

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   Mr. Carroll also asked Mr. Martinez whether, during any time Mr.

2   Martinez was a debtor in a bankruptcy case, Mr. Martinez

3   transferred anything of value to his children.  Again, Mr. Martinez

4   invoked the Fifth Amendment.[12]  The Court therefore infers that Mr.

5   Martinez transferred funds, both during and prior to the bankruptcy

6   case, to family members -- including the 7&8 Partnership -- and

7   that the transfer of funds was not for purposes of paying rent or

8   for compensating Mr. Martinez's children for any work they might

9   have performed on behalf of Mr. Martinez or his companies.[13]  The

10  Court also infers that Mr. Martinez exercised some degree of

11  control over the funds in 7&8 Partnership's bank account.

12

13

14  ─────────────

15      [12] Mr. Carroll also asked several questions of Mr. Martinez
    concerning the transfer of funds from the 7&8 Partnership to Mr.
16  Martinez.  Again, Mr. Martinez invoked the Fifth Amendment.

17      [13] The Court recognizes that it is possible that a portion of
    the payments was to compensate Mr. Martinez's children for work
18  performed for the companies controlled by Mr. Martinez.  However,
    because Mr. Martinez invoked the Fifth Amendment, Mr. Siu was
19  denied the opportunity to question Mr. Martinez about the purpose
    of these payments. As a result, there is no way to know whether the
20  purpose was valid or supported by consideration.  The Court is thus
    left with the negative inference that the transfers were gratuitous
21  and lacked consideration.

22

23

24

25

26

27

28

## C. The Sale to Mr. Siu

### Mr. Siu's Testimony[14]

In October 1999, Mr. Siu bought the Property, an approximately 1,200 square foot house in San Francisco's Excelsior District. When Mr. Siu purchased the Property, he was 24 years old and had graduated the previous year from the University of California, Davis, with a degree in electrical engineering. At the time of the purchase and thereafter, Mr. Siu lived with, and provided financial support to, his mother. Mr. Siu is now married and has two children, and the family -- together with Mr. Siu's mother -- lives at the Property. Mr. Siu is currently employed as a senior systems engineer for Xoom Corp., which provides international money transfer services.

Mr. Siu met Mr. Martinez through Mr. Martinez's son, Rod, who was Mr. Siu's co-worker at the time. Mr. Martinez approached Mr. Siu and offered to help Mr. Siu purchase a home, secure a loan, and perform construction work. Mr. Martinez told Mr. Siu that Mr. Martinez was a licensed contractor with M&M Construction, ran a mortgage company called Saratoga Mortgage Group -- which could provide Mr. Siu a loan -- and could help with the purchase through Century Medallion.

At the time when Mr. Martinez approached Mr. Siu, Mr. Siu was not actively looking for a place to buy. However, Mr. Siu was about to be evicted from his rental property because the rental property had been sold. Therefore, Mr. Siu and Mr. Martinez began

---

[14] All of the facts contained in this decision concerning Mr. Siu's purchase of the Property come from Mr. Siu's testimony. No other witness with personal knowledge of the transaction testified on this subject, not even Mr. Martinez.

to discuss a potential purchase. Mr. Siu told Mr. Martinez that because of Mr. Siu's financial circumstances, Mr. Siu would not be able to afford much. In response, Mr. Martinez told Mr. Siu that Mr. Martinez could secure a no-down-payment, "100% loan" for Mr. Siu.

Mr. Siu and Mr. Martinez did not discuss the type of property which Mr. Siu would be able to afford, but they did discuss that a "fixer upper" would meet Mr. Siu's budget requirement, and that Mr. Martinez could help repair the property to a livable condition. As a result, Mr. Siu agreed to engage Mr. Martinez to be his real estate broker, mortgage broker, and contractor. Prior to Mr. Siu engaging Mr. Martinez, Mr. Martinez never mentioned any potential conflict of interest, despite Mr. Martinez's multiple roles.

Mr. Siu worked with Mr. Martinez's daughter, Ann Martinez, to find a property. Ann Martinez worked for Century Medallion as a real estate salesperson and worked with SMG to secure a loan for Mr. Siu.[15] Mr. Siu understood that SMG was Mr. Martinez's company.

After selecting the Property and entering into a contract to buy it, Mr. Siu inspected the Property prior to closing along with Mr. Martinez. The two discussed removing the mildewed carpet and refinishing the hardwood floors underneath, painting the mildewed walls, updating the electrical components, remodeling the bathroom, replacing the windows, and other construction work. At that time,

---

[15] It is therefore apparent that Ann Martinez performed work for Mr. Martinez and/or his companies for which some compensation was undoubtedly due, at least during 1999. However, as discussed supra, it is not possible for this Court to determine whether any of the payments made by Mr. Martinez to the 7&8 Partnership or to other family members were made to compensate family members for work they performed.

Mr. Martinez thought that the cost of performing all of the necessary work would run between $45,000.00 and $50,000.00. To finance the work, Mr. Siu needed to obtain a construction loan, but Mr. Martinez also required a deposit for the work.

Mr. Siu paid $290,000.00 for the Property.[16] When Mr. Siu bought the Property, Mr. Siu did not qualify for a loan on his own, so Peter Tse co-signed.[17] Mr. Tse never owned any interest in the Property. Mr. Siu paid $8,700.00 into escrow as a deposit, which emptied out Mr. Siu's and his mother's bank accounts. There was a loan origination fee of $2,465.00, as well as other fees paid to SMG for the appraisal, credit report, processing, and administration.[18] Shortly after the sale closed, Mr. Siu received a credit of $4,940.16 from escrow.

The closing occurred in late October 1999.[19] At the time of closing, tenants were living at the Property. To entice the tenants to move out, Mr. Martinez wrote a letter to the tenants and

---

[16] The Buyer's Closing Statement reflects the sales price and also indicates that the total of the first loan was $246,500.00 and the total of the second loan was $43,500.00. Mr. Siu has no idea what the Property is worth today.

[17] Mr. Tse's exact relationship to Mr. Siu or motivation for co-signing on the loan were not in evidence.

[18] The Buyer's Closing Statement shows a loan origination fee to SMG of $2,465.00, a processing fee of $495.00 paid to SMG, and an administrative fee of $205.00 paid to SMG. The Buyer's Closing Statement also shows that $71.00 would be paid to M&M Construction for painting and carpets.

[19] A letter from Old Republic Title Co. to Mr. Siu and Peter Tse dated October 25, 1999, stated that the conveyance documents were recorded on October 22, 1999, and that escrow had closed. A check to both buyers in the amount of $4,940.16 was enclosed with the letter.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   helped Mr. Siu reach a financial arrangement with the tenants.  For

2   $5,000.00, the tenants agreed to move out immediately.  Mr. Siu

3   borrowed the $5,000.00 from family and friends.

4        The closing settlement statement for the seller of the

5   Property contained a piece of information of which Mr. Siu had no

6   knowledge until several years later.  Mr. Siu testified that Mr.

7   Siu first obtained a copy of this document during the state court

8   litigation in approximately 2008.  At closing, the seller provided

9   $10,000.00 to M&M Construction -- Mr. Martinez's company -- to

10  perform painting and carpet work at the Property.

11       Mr. Siu moved into the Property in December 1999.  At that

12  time, Mr. Martinez had not begun any construction or remodeling

13  work at the Property.  Shortly after Mr. Siu moved into the

14  Property, and at Mr. Martinez's request, Mr. Siu wrote a check to

15  Mr. Martinez in the amount of $4,700.00 to serve as a deposit for

16  the work, although there was no written contract at that point in

17  time.

18       When Mr. Martinez requested the $4,700.00 deposit, Mr.

19  Martinez did not advise Mr. Siu that Mr. Martinez was limited to

20  receiving a maximum deposit of $1,000 -- the deposit could be 10%

21  of the contract price or $1,000.00, whichever was less.  Mr.

22  Martinez also did not provide any information to Mr. Siu describing

23  Mr. Siu's rights as a home improvement client.

24       On December 15, 1999, Mr. Martinez's workers began to perform

25  tile work in the bathroom and some window work.  For a period of

26  approximately five months -- from December 15 until the middle of

27  May 2000 -- workers spent a considerable amount of time at the

28  Property performing various projects, usually five days a week.

Mr. Martinez began the work without a formal contract in place. Mr. Siu repeatedly requested that a contract be provided, but Mr. Martinez did not provide a written contract to Mr. Siu until April 2000. Despite the absence of a contract, Mr. Siu nevertheless allowed Mr. Martinez to perform the work, and did not protest when Mr. Martinez sent workers to the Property. The contract, which is dated April 10, 2000, reflects the $4,700.00 which Mr. Siu paid the previous December. Both Mr. Siu and Mr. Martinez -- on behalf of M&M Construction -- signed the contract.

Under the contract, Mr. Martinez offered to remodel the Property, with the following line items:[20] paint interior complete ($4,000); sheetrock patch partial (dollar amount not stated); bath, MBR, kit hall ($700); hardwood floors ($3,000); vinyl floors ($2,800); stairs ($450); hand rail ($350); tile at entry ($200); wainscot ($1,200); bath tile at walls allow ($900); bath all new fix ($1,075); refinish buffet in DR ($450); windows & doors ($2,955); cabinets ($8,000); appliances allowance ($2,100); insulation ($260); fire walls ($1,420); vents at garage & misc ($170); supervision 80 hours at $65 ($3,000); electrical panel ($1,200); electrical upstairs ($1,800); new 3/6 deck with rail ($340). The contract contains a line item for building permits, but has no dollar figure listed. The contract lists three additional items for supervision of second phase ($2,944.98), completion of second phase ($4,680.00), and completion of the downstairs ($5,380.00).

---

[20] The abbreviations which follow come directly from the contract.

1   The second page of the contract shows that the total for all
2   work is $50,770.15, including $14,400.15 of work already completed.
3   It also shows the $4,700.00 deposit, as well as a credit "per OJM"
4   of $18,315.00, for a total contract price of $40,760.13.

5   The credit "per OJM" warrants further discussion. While the
6   contract specified that M&M would "paint interior complete" for
7   $4,000.00, there was also a credit for $4,000.00. Similarly, the
8   contract gave credits of $3,000.00 for hardwood floors, $2,800.00
9   for vinyl floors, $450.00 for stairs, $350.00 for the handrail,
10  $200.00 for tile at entry, $1,200.00 for wainscot, $900.00 for bath
11  tile at walls allow, $450.00 for bath all new fix, $450.00 for
12  refinish buffet in DR, $375.00 for windows and doors, $450.00 for
13  cabinets, $2,100.00 for appliances, $1,420.00 for firewalls, and
14  $170.00 for vents at garage & misc, for a total of $18,315.00.
15  Although Mr. Siu's expert, Mr. Richards, did not believe these were
16  credits in the true sense of the word because Mr. Siu paid the
17  entire amount of the contract up front, these credits appear to
18  have reduced the overall amount due under the contract.

19  Mr. Siu also testified that he recalled receiving some money
20  from M&M Construction. Mr. Siu specifically recalled receiving a
21  check, dated May 19, 2000, in the amount of $7,000.00 from Mr.
22  Martinez in good funds.[21]

23  _____

24  [21] At trial, Mr. Martinez offered this check into evidence.
    Mr. Carroll objected because the check had not been produced during
25  discovery. Mr. Siu testified, however, that Mr. Siu did receive
    the check from Mr. Martinez. The Court took the objection under
26  advisement, and now rules that Exhibit M is admitted. Although Mr.
    Martinez failed to disclose the check during discovery, Mr. Siu
27  clearly had knowledge of the check based upon his actual receipt of
    it.

28

Mr. Siu obtained a construction loan in the amount of $43,760.00 in April 2000 to pay for the remainder of the work under the contract. The construction loan was funded by First Financial Funding Group through the Money Store. After a $3,000.00 settlement charge, there was a net of $40,760.00, which was paid in three checks issued jointly to Mr. Siu, Mr. Tse, and M&M Construction on April 29, 2000.[22] Mr. Siu and Mr. Tse signed the checks over and delivered them to Mr. Martinez on May 16, 2000.[23] However, at that time, and in Mr. Siu's opinion, Mr. Martinez was not entitled to this entire payment because Mr. Martinez had not yet performed $40,000.00 worth of work; Mr. Martinez had only replaced a window, remodeled the bathroom, and done some demolition work, for which the compensation due to Mr. Martinez was less than $40,000.00. The loan was brokered by SMG which received $2,198.00 of the $3,000.00 settlement charge.

Much of the work performed by Mr. Martinez's subcontractors was defective or performed in a careless manner, as demonstrated by many of the photographs Mr. Siu provided, along with Mr. Siu's testimony. However, there was no direct evidence that the subcontractors lacked the qualifications to perform the work, or that Mr. Martinez knew the subcontractors were unqualified or would perform substandard work. Mr. Siu began to notice problems with the work sometime in June 2000. After Mr. Martinez received the construction loan funds, Mr. Martinez's workers punched holes

---

[22] April 29, 2000, is also the date of the promissory note for this loan.

[23] It was unclear from the testimony whether Mr. Martinez ever deposited the checks into any particular account.

through the ceiling for plumbing work, but it was raining and water entered the house -- Mr. Siu later paid another contractor $350.00 to repair the hole. The workers installed the tiles in the kitchen -- twice -- in an uneven[24] and defective manner, failed to caulk the windows causing them to leak, installed electrical receptacles in an unsafe manner, damaged the electrical connection to the doorbell, failed to mitigate exposed asbestos on the central heating ventilation pipe (which Mr. Siu paid $10,000.00 to mitigate), installed a deck without sealing the exposed framing of the house, and damaged a wall when relocating a vent. Mr. Siu testified that an electrician spent an entire day trying to fix the doorbell, to no avail, and Mr. Siu eventually let the electrician leave when the electrician pleaded to be let go.[25]

In addition, Mr. Martinez failed to perform many of the tasks specified in the contract for which Mr. Martinez had received payment. Mr. Martinez never removed the carpet, did not repair or refinish the wood floors, did not repair the broken handrails, and did not paint all of the walls, among other things.[26] Mr. Siu eventually removed the carpet on his own.

---

[24] Mr. Siu testified that the tiles were uneven as the result of a defective installation. Although Mr. Martinez made comments while cross-examining Mr. Siu which hinted at another cause -- such as a person walking on the tiles before the tiles had a chance to set -- Mr. Siu testified that nobody had walked on the tiles. Mr. Martinez did not offer any contrary evidence.

[25] Mr. Martinez did not offer to install a battery-operated doorbell to replace the hard-wired doorbell. However, Mr. Siu stated that Mr. Siu would not have been satisfied with a battery operated doorbell because Mr. Siu liked the sound produced by the vintage doorbell which was original to the house.

[26] The uncompleted work required by the contract was addressed by Mr. Siu's expert, John Richards, and is discussed infra.

The first complaint Mr. Siu made about any of the work was made to the workers, directly, about the need to seal up the windows. In May 2000, Mr. Siu complained to Mr. Martinez for the first time about the flooring, the painting, and the water leaking into the house. Mr. Martinez denied responsibility for the work and said the work was not covered in the contract. After this first complaint to Mr. Martinez, Mr. Siu sensed that the relationship had begun to turn. Mr. Siu tried to communicate further with Mr. Martinez about Mr. Siu's concerns. Mr. Siu telephoned Mr. Martinez and left messages inquiring about the flooring, the doorbells, and the completion of the project, but Mr. Martinez did not return his calls.

Mr. Siu also tried sending written communications to Mr. Martinez by fax. On October 26, 2000, Mr. Martinez sent a fax to Mr. Siu which appears to have been an attempt to resolve the conflict about the completion of the work. Mr. Siu sent a response to Mr. Martinez by fax the same day, stating that the work needed to be completed and complaining that Mr. Siu had waited more than four months. Mr. Martinez faxed a reply on October 30, 2000, stating that Mr. Siu was not allowing Mr. Martinez to complete the work until another contractor could review the matter, and stating that several of the items Mr. Siu wanted done were not included in the contract.

With the exception of sending an electrician to try to fix the doorbell, Mr. Martinez ceased performing any work at the Property by June 18, 2000, and from Mr. Siu's point of view, Mr. Martinez

1  had performed all the work Mr. Martinez was willing to do.[27]

2  However, from Mr. Martinez's October 30, 2000 fax, the Court could

3  just as easily infer that Mr. Martinez's failure to return to the

4  job site was not out of unwillingness, but instead was because Mr.

5  Martinez understood that Mr. Siu did not want Mr. Martinez to

6  return until another contractor had examined the job site.

7       Mr. Siu also asked Mr. Martinez to provide Mr. Siu with the

8  job permit.  No permit had been "pulled" when the work began, but

9  Mr. Martinez eventually obtained one.  When Mr. Martinez left the

10 job in June, Mr. Martinez took the permit with him and refused to

11 provide the "job card" to Mr. Siu.  At Mr. Siu's expense of

12 approximately $30.00 to $50.00, Mr. Siu obtained a copy of a new

13 job card and was required to obtain new signatures showing the

14 inspectors's approval of work that had been performed at various

15 stages of the construction.

16      Clearly, Mr. Siu and Mr. Martinez disagreed about the scope of

17 the work provided for in the contract.  As a complication, Mr.

18 Martinez never gave Mr. Siu a document stating when the work at the

19 Property was expected to be completed.  Mr. Martinez also never

20 gave Mr. Siu a schedule for making progress payments, although no

21 such schedule was required, as discussed infra.

22      Mr. Siu also testified about a line of credit Mr. Siu obtained

23 in the amount of $100,000.00 after Mr. Martinez ceased work at the

24 Property.  Of this amount, Mr. Siu used $91,000.00 to improve the

25

26      [27] Mr. Martinez did not testify that Mr. Martinez was willing
   to do any additional work after June 18, 2000.

27

28

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

Property to make it livable.[28]  Mr. Siu invested a portion of the line of credit and has lost some of the money.  Mr. Siu also paid $15,000.00 to repair the roof -- which was not part of the original contract -- and had the roofing company repair a leak near a light well.

Mr. Siu also offered testimony about Mr. Martinez's various companies and cash flowing in and out of those companies.  In this regard, Mr. Siu testified about bank statements, checks, and the Statement of Financial Affairs.  On cross-examination, Mr. Siu admitted that Mr. Siu is not a CPA, and Mr. Siu has no experience running a real estate office, a mortgage business, or a construction business.  Mr. Siu also admitted that Mr. Siu does not know how real estate agents get paid, or when they get paid.  Mr. Siu also lacks knowledge about what percentages a real estate office allocates to overhead expenses.

Mr. Siu did not know exactly what Mr. Siu had spent on attorney's fees as the result of litigation against Mr. Martinez and M&M Construction stemming from the Property, but Mr. Siu believed he has spent more than $35,000.00 in such attorney's fees.[29]  Mr. Siu did not anticipate having to pay any additional attorney's fees for this adversary proceeding.

---

[28] Mr. Siu offered receipts from Home Depot into evidence, which demonstrated Mr. Siu's out-of-pocket repair costs for items such as wall plates, paint rollers, and light bulbs, among other things.

[29] No hard evidence of these fees -- such as bills or checks -- was offered in evidence.  Also, the fees incurred by Mr. Siu to pursue litigation against M&M Construction are not at issue in this adversary proceeding.

**Mr. Richards' Testimony**[30]

On the subject of what the contract required, and what work was actually done or done correctly, Mr. Siu retained John Richards to provide expert opinions.[31] Mr. Siu also retained Mr. Richards to provide opinions about whether Mr. Martinez complied with the terms of the contract or with applicable laws and industry practices. The bulk of Mr. Richards's testimony pertains solely to the § 523(a) claims (which are moot), and not to the § 727(a) claims, but for the sake of a complete record, the Court makes these findings.

Mr. Richards is a 1968 graduate of the University of California, Berkeley, with degrees in civil and structural engineering. Mr. Richards has over forty years of construction and construction management experience, including two years of experience as a design engineer, 11 years of experience as a construction engineer, and more than 30 years of experience working in his own residential construction and remodeling company, John W. Richards Construction Co., formed in 1979. Mr. Richards has a California contractors "B license" and has done many light commercial and industrial projects in addition to his numerous residential projects. Since 2001, Mr. Richards has overseen the administration of contracts and change orders for school districts around the state.

---

[30] The facts pertaining to Mr. Richards's experience, observations, and conclusions come entirely from Mr. Richards's testimony.

[31] Mr. Richards testified that he has served as an expert witness three times, and in each case the attorney was Mr. Carroll. However, Mr. Richards also stated that he has been engaged to render opinions for other attorneys.

In addition, for nearly two years, Mr. Richards served as an arbiter for the California Contractors License Board in the late 1990's reviewing disputes between homeowners and contractors in binding arbitration. As an arbiter, Mr. Richards applied Contractor's License Board laws, customs, and industry practices in adjudicating disputes.

Mr. Richards became involved in this dispute in July 2003 when he was asked to review the documents, visit and inspect the Property, look at photographs, and prepare an estimate of the value of the work performed by Mr. Martinez. Mr. Richards was also asked to prepare a contract and an estimate for completing the unfinished work and fixing the deficient work. In 2003, Mr. Richards went to the Property twice and took notes for the estimate, for which Mr. Richards understood he would be paid $100.00 per hour, regardless of whether Mr. Richards was hired to do the work. Mr. Richards believed that he was paid approximately $500.00 to prepare the estimate and $2,000.00 to review the documents. In addition, Mr. Richards planned to charge $100.00 per hour for the time spent testifying at trial. Mr. Richards visited the Property for a third time in 2011. Before testifying, Mr. Richards had been paid $2,050.00, which did not include an additional $5,000.00 not yet billed for work performed in 2011.

Much of Mr. Richards's testimony consisted of summarizing the exhibits and interpreting the laws applicable to the exhibits. Mr. Richards also testified concerning the quality of the work performed by Mr. Martinez's workers, as well as to how much money it would cost -- both in 2003 and at the time of Mr. Richards's

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1   testimony -- to repair the defective work and to complete the work

2   in the contract which Mr. Martinez did not perform.

3       Among the documents reviewed by Mr. Richards was the contract

4   between Mr. Siu and M&M Construction.  Mr. Richards found several

5   things wrong with the contract, which took Mr. Richards a long time

6   to analyze.  According to Mr. Richards, the law requires a license

7   number to be on all contracts, but the license number on this

8   contract did not belong to Mr. Martinez.[32]  This was suspicious to

9   Mr. Richards, who opined that contractors should know their license

10  numbers like they know their addresses and phone numbers.[33]  Mr.

11  Richards searched for Mr. Martinez's license number, and upon

12  finding it learned that Mr. Martinez's license had been suspended

13  since November 15, 1999, after Frederick Meissner, the responsible

14  managing partner, disassociated from M&M Construction.  The

15  licensing board gave Mr. Martinez a continuance to operate M&M

16  Construction from November 15, 1999, until November 15, 2000, but

17  the correspondence from the Contractors State License Board

18  specifically prohibited Mr. Martinez from entering into any new

19  contracts on behalf of M&M Construction.[34]  In addition, M&M

20  _____

21  [32] The license number on the contract was 669356.  However, Mr.
    Martinez's license number was 669353.

22  [33] The difference in license numbers is not suspicious to the
23  Court, and the Court finds that the incorrect license number on the
    contract was most likely a mere typographical error.  The use of a
24  "6" in lieu of a "3" as the terminal digit of the license number
    can easily be explained by the fact that these two numbers appear
25  on adjacent keys on a numeric keyboard.

26  [34] A letter dated November 15, 1999, stated: "NO NEW CONTRACTS
    are allowed under the provisions of this continuance" and the
27  continuance of the license was only valid for contracts signed, or
    projects begun, before November 15, 1999.  Another letter from the
28                                                        (continued...)

1  Construction's surety had been cancelled, leading to a further

2  suspension of the license on March 1, 2000.[35]

3      Because Mr. Martinez was not operating with a valid license,[36]

4  Mr. Richards opined that Mr. Siu had been injured on many levels.

5  Mr. Siu was injured because Mr. Siu was dealing with an entity that

6  was operating outside of the state licensing board -- although Mr.

7  Richards conceded that the board had jurisdiction to penalize the

8  unlicensed operation.  Mr. Siu was also injured because Mr. Siu did

9  not have access to any bond money for the defective and abandoned

10  work, and because unlicensed contractors cannot obtain construction

11  work permits.

12      Regarding the contract's terms, Mr. Richards determined that

13  the scope of work outlined in the contract was not completed before

14  Mr. Martinez abandoned the project.  Mr. Richards concluded that

---

15      [34](...continued)

16  Contractors State License Board dated November 16, 2000, advised
   Mr. Martinez that the license was cancelled on November 15, 2000.

17      Interestingly, although no formal, written contract was signed

18  until April 10, 2000, the project had begun before November 15,
   1999.  This was because the agreement to perform construction work

19  at the Property was linked to the entire sale transaction; Mr. Siu
   bought a "fixer upper" that Mr. Siu intended to have Mr. Martinez

20  fix.  As a result, the Court cannot find that Mr. Martinez's
   representation to Mr. Siu that Mr. Martinez was licensed was a

21  false representation, or that Mr. Martinez intended to deceive Mr.
   Siu in making that representation.

22

23      [35] A Notice of License Suspension dated March 1, 2000, from the
   Contractors State License Board to M&M Construction was premised

24  upon the cancellation of bond number 6005081 written by Surety
   Company of the Pacific for license number 669353.

25

26      [36] The Court infers from Mr. Martinez's invocation of the Fifth
   Amendment that Mr. Martinez knew his license was suspended with a

27  limited extension, because Mr. Martinez refused to answer a
   question as to whether Mr. Martinez represented to Mr. Siu that Mr.

28  Martinez was a licensed contractor before providing a contract to
   Mr. Siu.

Mr. Martinez had abandoned the project because it had been more than two years since Mr. Martinez had been on the job; however, as discussed <u>supra</u>, there is also some evidence that Mr. Martinez did not return to the job because Mr. Martinez believed that Mr. Siu did not want Mr. Martinez to return until after another contractor could review the work. Therefore, the Court cannot conclude, definitively, that Mr. Martinez abandoned the job; instead, the Court can only find that not all of the work specified in the contract was actually completed.

Some of the required work was, in Mr. Richards's view, willfully never completed, for example: Mr. Martinez did not paint all that was supposed to be painted;[37] Mr. Martinez did not do anything with the hardwood floors other than some demolition, and left the floor in an unsafe condition with tripping hazards; Mr. Martinez did not refinish the stairs; Mr. Martinez did not repair the handrails; Mr. Martinez did not install a firewall or insulation; and Mr. Martinez failed to install smoke detectors. Mr. Richards also opined that some of the work was performed in a willfully incompetent manner and needed to be repaired, for example: the windows were poorly installed without flashing or caulk; the tile in the kitchen floor was grossly installed out of level, presenting a tripping hazard;[38] the doorbell was non-

[37] As for the painting and carpets, Mr. Richards was particularly disturbed, because M&M Construction had already received $10,000.00 at the close of escrow to perform this work, in addition to payment under the original contract. Mr. Richards estimated that the cost to paint would be $3,750.00 plus a mark-up of 39.5% for overhead, profit, a permit, liability insurance, the bond, and a contingency.

[38] Mr. Richards acknowledged the possibility that someone may
(continued...)

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1 functional;[39] electrical receptacles were installed in an unsafe
2 manner without cover plates; an exhaust flume was left uninstalled;
3 plumbing pipes were not secured; asbestos was disturbed and left
4 exposed; and the vent pipe that was installed had a leak around it
5 which was not repaired. Again, Mr. Richards's determination that
6 Mr. Martinez's failures to perform or complete the work in a
7 competent fashion were "willful" derives from Mr. Richards's
8 conclusion that Mr. Martinez abandoned the job, which this Court
9 cannot find on this record.

10      Mr. Richards also explained that the contract was deficient
11 and missing key terms, which harmed Mr. Siu because Mr. Siu was
12 left at the mercy and discretion of Mr. Martinez. The contract
13 lacked a starting date or an estimated completion date. The
14 contract did not specify the materials or equipment to be used in
15 the job so that Mr. Siu could evaluate the job's expected quality
16 and quantity. The work described in the contract was insufficient;
17 for instance, regarding the windows, the contract did not state if
18 the windows would be custom made, what brand the windows would be,
19 and other attributes. For cabinets, the contract did not specify
20 the make; the cabinets could come from Ikea or Italy. The contract
21 lacked a progress payment schedule to allow Mr. Martinez to bill
22 for work that was completed along the way, although Mr. Richards
23 agreed that progress payments are not a required provision.

24

25      [38](...continued)
   have walked on the tiles before the work had dried, but believed
26 that the unevenness was caused by poor installation. Mr. Richards
   estimated the cost of reinstalling the floor with new marble would
27 be $4,075.00.

28      [39] Mr. Richards estimated that the cost of repairing the
   doorbell in 2003 would have been $65.00.

1    Mr. Richards talked at length about the $4,700.00 deposit
2  which Mr. Siu paid at the start of the work.  Mr. Richards
3  explained that a home improvement contractor is not allowed to
4  accept a down payment before starting work in excess of $1,000.00
5  -- the contractor may accept payment of the lesser of 10% of the
6  contract price[40] or $1,000.00.  Mr. Richards described the practice
7  of accepting pre-payment of the contract as "front end loading,"
8  because the payment is "loaded" at the "front" of the job.  Mr.
9  Richards stated that this is a dangerous practice because the
10  contractor can receive more money than the contractor has earned
11  for any work completed, and the homeowner loses control of the job
12  because the contractor can abandon the job prior to completion or
13  ask for additional money to complete the work for which there has
14  already been payment.  Mr. Richards explained that front end
15  loading is not only illegal, but it is also not a custom or
16  practice within the industry.  For substantially these same
17  reasons, Mr. Richards objected to Mr. Martinez's receipt of the
18  construction loan funds in May 2000 before the job had been
19  completed.

20    Mr. Richards assigned a value of $22,000.00 to the work that
21  was completed competently by Mr. Martinez's subcontractors.  This
22  value was based upon labor rates of $55.00 per hour and material
23  costs of $3,000.00.  Mr. Richards stated that if the workers had
24  been paid $15.00 per hour, it is possible that Mr. Martinez might
25  have spent only $11,000.00 on the project with a profit upwards of
26  $40,000.00, but Mr. Richards did not view this as a realistic

27
28        [40] Ten percent of the contract at issue in this case was at
     least $4,700.00, which exceeded the $1,000.00 limit which Mr.
     Martinez could accept.

possibility. Mr. Richards agreed that it was possible that Mr. Martinez spent as much as $50,000.00 on the project.

The fact that at least $22,000.00 worth of valuable, competent work was performed indicates that when Mr. Martinez first agreed to perform the work, he intended to perform competent work. In other words, there is no evidence that Mr. Martinez intended, or had reason to believe, that the work would be performed in a defective or injurious manner, or that an injury to Mr. Siu was substantially certain to occur. Although the evidence shows that Mr. Martinez may have had a conflict of interest and played fast and loose with California laws -- including through receipt of an excessive down payment and of the entire contract price prior to completion of the project -- the evidence does not show that Mr. Martinez accepted these funds with no intention to perform any work.

Mr. Richards provided Mr. Siu with a contract proposal in 2003. The proposal is dated July 10, 2003, and estimated a total cost of $90,150.00 to correct and complete the work at the Property. Based on inflation, at the time of Mr. Richards's testimony, the cost would have risen to $126,904.00. However, Mr. Richards stated that a low-end contractor might charge only $100,000.00 to perform the same work. Mr. Richards's proposal contained a 3-day mandatory waiting period, and projected that the work could be completed in 75 calendar days. Mr. Richards would have signed the contract if Mr. Siu had asked, but Mr. Siu has not signed the contract and Mr. Richards does not expect that Mr. Siu will.

Also on July 10, 2003, Mr. Richards prepared a second proposal for $6,050.00 to repair only the windows, for which Mr. Richards

1  recommended immediate work because the windows had been "poorly and
2  grossly installed" with a willful departure from industry
3  standards.  Mr. Richards explained that the windows were not
4  properly flashed or caulked to prevent rainwater from penetrating
5  the wood.  Mr. Richards was concerned that this presented a safety
6  hazard because of potential dry rot or mold.

7      Mr. Richards explained that there is a profit margin built
8  into every construction contract.  In 2000, it was customary to
9  charge 5% profit or more.  In addition, contracts take into account
10 overhead costs -- such as for insurance and the bond -- and in this
11 regard 50% was customarily standard for overhead in 2000.  Mr.
12 Richards also explained that a contract typically includes a 15%
13 contingency, which is returned to the owner if not used.  If
14 unanticipated work arises during a project -- for instance, if a
15 wall is opened up and a leaky pipe is found -- the parties will
16 enter into a new agreement called a change order if the owner wants
17 it repaired.

18     Mr. Richards also explained that it costs more to correct
19 defective work than to perform the work correctly from the
20 beginning, especially when work is done out of sequence.  Mr.
21 Richards stated that if he had been the first contractor on the
22 job, it would have cost about $80,000.00 to perform all of the work
23 using competent journeymen, plumbers, and electricians.  The labor
24 rate would have been approximately $440.00 per day over two to
25 three months.  Although Mr. Martinez received less than this amount
26 -- approximately $55,460.00 -- Mr. Richards stated that the work
27 could have been performed ethically and competently for that
28 figure, particularly if the work had been done at non-union rates

or by less skilled workers.  However, the dramatic difference in price between what Mr. Martinez actually charged and what Mr. Richards would have charged from the project's inception suggests that Mr. Siu -- who is a bright, comparatively sophisticated person with a degree in electrical engineering -- ought to have known that Mr. Martinez was charging a bargain-basement price.

Mr. Richards stated that in 2003, it should have cost between $65,000.00 and $85,000.00 to do the job from scratch, but in 2012 it would cost from $85,000.00 to $105,000.00.  Mr. Richards stated that Mr. Richards would have charged $79,717 in 2003 to complete the unfinished work, and he would have charged a total of $90,000.00 if also repairing the defective work.  Also, Mr. Richards attributed $53,836.00 in 2003 dollars to the cost of fixing willful safety departures.[41]  Mr. Richards thought that another insured, competent contractor might have been willing to complete the unfinished work and repair the defective work for as little as $70,000.00 in 2003.  In 2011, Mr. Richards would have charged $118,579.00 to complete the unfinished work.

Mr. Richards offered testimony about a proposal which Mr. Martinez made in a faxed transmission to Mr. Siu on October 30, 2000, to come back to the Property and perform additional work -- or "extras" -- for the sum of $6,546.33.  Mr. Richards was particularly concerned about this proposal, which Mr. Richards characterized as a "bogus change order" because the work included in the new proposal duplicated the work under the original contract for which Mr. Siu had already made payment.

---

[41] Adjusting for inflation, Mr. Richards stated that this amount would have increased to $82,823.00 in 2011.

Mr. Martinez's October 30, 2000 proposal included the following: (1) prepare, level and install base wonder board including material in kitchen and breakfast area ($450.00); (2) install marble and grout including material which was returned, material $367.23, labor $441.00 ($808.23); (3) repair kitchen area (after someone walked on the floor before it was ready), second time billed at 50% of cost ($275.00); (4) install tile and grout and finish bathroom floor (including material complete) ($300.00); (5) install tile at bathtub (floor to ceiling) ($900.00); (6) tile kitchen counters including material ($1,200.00); (7) building permits for April 26, 2000 ($211.36); (8) inspection fee for May 30 or 31 ($67.00); and (9) items required by the inspector. The following were listed as items required by the inspector: inspection fees ($214.74); three GFI (one garage, one bath, one rear house) ($225); one smoke detector ($75); material sheetrock fire wall ($140); labor for fire wall 16 man hours ($720); insulate wall material ($220); install insulation 8 hours ($360); rewire bath, one switch, one light, one fan ($225); rewire one plug, one light in bedroom ($150); move electric meter material ($75); labor electric meter 4 hours ($180). In addition, there were entries for the bathroom floor ($250.00), moving a shut off valve ($100.00), and purchase and installation of a dishwasher ($375.00). Credits totaling $250.00 were listed for a toilet and vanity.

The October 30, 2000, proposal is troubling to the extent that Mr. Martinez sought compensation for items contained or subsumed within the original contract. However, Mr. Siu did not sign or otherwise accept the October 30, 2000 proposal, and thus was not injured by it.

Mr. Richards stated that the installation of countertops was implicit in the original contract because the cabinets could not be replaced without installing countertops. Mr. Richards also stated that the term "electrical upstairs" from the contract was vague but required, at a minimum, bringing the electrical components up to code.

Mr. Richards also testified about the issues which arose concerning the building permit and permit inspection card. According to Mr. Richards, both the building permit and the permit inspection card were required to be posted at the site at all times, then should have been left with the homeowner when all work was completed. These documents remain at the site so that inspectors who come to the site know what work is permitted to be done and what work has been accomplished. If lost, the permit or inspection card needs to be replaced, and any signatures need to be redone.

According to Mr. Richards, the City of San Francisco might have given final approval for the project notwithstanding problems at the Property, but Mr. Richards did not know for certain.[42] Mr. Richards had examined the job card and noticed that several items, such as the plumbing, had been approved. Mr. Richards stated that the city's inspector might have overlooked some of the problems, such as the floor and the electrical outlets.

---

[42] The inspection record from City and County of San Francisco Department of Building Inspection indicates that the final inspection and approval occurred on January 22, 2001.

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1

## Other Facts in Evidence

2    Mr. Siu executed a joint and several straight note dated May

3    30, 2000, promising to pay $14,046.33 to M&M Construction.  Mr. Siu

4    signed the note on June 2, 2000.  Mr. Tse's name was on the note,

5    but Mr. Tse did not sign the note.  A deed of trust in favor of M&M

6    Construction with an assignment of rents was prepared -- apparently

7    by Mr. Martinez -- to go with the note, but the deed of trust was

8    never signed by Mr. Siu or recorded.

9    The evidence also shows that on March 22, 2002, Mr. Siu filed

10    a civil complaint against Mr. Martinez and M&M Construction in the

11    Superior Court of the State of California in San Francisco, Case

12    No. 405942.  Mr. Siu asserted a variety of state law statutory and

13    common law claims, including claims of fraud and breach of

14    fiduciary duty.  No such state law claims have been asserted in

15    this adversary proceeding.

16    Mr. Siu obtained a judgment from the state court dated

17    November 24, 2003, against M&M Construction by default.  The state

18    court found that the home improvement construction contract between

19    Mr. Siu and M&M Construction violated Civil Code § 1689.7 and

20    Business and Professions Code §§ 7159 and 7163, and that the

21    contract was unenforceable.  The state court rescinded the

22    contract.  The state court also found that the promissory note

23    violated Business and Professions Code § 7163, Civil Code § 1689.8,

24    Civil Code §§ 1801 et seq., and Civil Code § 1770(b)(1), and was

25    void and unenforceable.  The state court awarded restitution to Mr.

26    Siu of all amounts paid, which was $55,531.00, with interest.  The

27    state court also awarded Mr. Siu $93,814.74 in monetary damages to

28    repair defective work at the Property, as well as attorney's fees

and costs. The total judgment was originally $221,088.46, but M&M Construction moved to set aside the judgment, and the motion was granted in part because the amount of the judgment exceeded what was requested in the complaint. The judgment against M&M Construction was modified on January 19, 2006, to reflect a principal amount of $151,742.72, being the aggregate amount of compensatory damages from the complaint and attorney's fees.

**IV. Conclusions of Law**

    **A. Denial of Discharge Under 11 U.S.C. § 727(a)**

    Mr. Siu seeks to deny Mr. Martinez a bankruptcy discharge under 11 U.S.C. §§ 727(a)(2)(A) and (a)(4)(A). Under section 727(a), the Court shall grant Mr. Martinez -- the Debtor -- a discharge, unless:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>     (A) property of the debtor,
>     within one year before the date of
>     the filing of the petition; or . . .
> (4) the debtor knowingly and fraudulently, in or in connection with the case--
>     (A) made a false oath or
>     account; . . .

Mr. Siu bears the burden of establishing these claims by a preponderance of the evidence. See Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010). Notwithstanding this burden, because the Bankruptcy Code's purpose is to provide debtors with a fresh start, section 727 is to be construed liberally in favor of debtors and against the party objecting to a discharge. Id. (citing Bernard v. Sheaffer (In re Bernard), 96 F.3d 1279, 1281

(9th Cir. 1996). This does not change the preponderance of the evidence standard, but instead means that a plaintiff must prove actual, rather than constructive, intent. <u>Khalil v. Developers Surety & Indemnity Co. (In re Khalil)</u>, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007).

To establish a claim under § 727(a)(2)(A), a plaintiff must show that there was "(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property." <u>See Retz</u>, 606 F.3d at 1200 (citing <u>Hughes v. Lawson (In re Lawson)</u>, 122 F.3d 1237, 1240 (9th Cir. 1997)) (internal quotes omitted). A debtor's intent can be inferred from the surrounding circumstances or from a debtor's course of conduct. <u>See Searles v. Riley (In re Searles)</u>, 317 B.R. 368, 379-80 (B.A.P. 9th Cir. 2004). If a plaintiff establishes an intent to hinder or delay creditors, then such plaintiff is not required to establish a fraudulent intent. <u>See Retz</u>, 606 F.3d at 1200. A plaintiff is also not required to establish any injury to creditors. <u>See id.</u>

To prevail on a claim under § 727(a)(4)(A), a plaintiff must establish the following: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." <u>See Retz</u>, 606 F.3d at 1197 (citing <u>Roberts v. Erhard (In re Roberts)</u>, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005) (internal quotations omitted). A false statement in a Statement of Financial Affairs can be a false oath for purposes of this statute. <u>See In re Khalil</u>, 379 B.R. at 172. To be material, a fact must

bear a "relationship to the debtor's business transactions or estate, or [must concern] the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Retz, 606 F.3d at 1198 (citing In re Khalil, 379 B.R. at 173) (internal quotations omitted).  For a debtor's actions to be knowingly made, the debtor must have acted deliberately and consciously.  Retz, 606 F.3d at 1198.  Again, as under § 727(a)(2)(A), a debtor's fraudulent intent for purposes of § 727(a)(4)(A) can be demonstrated by circumstantial evidence, such as the debtor's course of conduct and pattern of action.  Id. at 1198-99.

Mr. Siu has argued that Mr. Martinez should be denied a discharge under § 727(a)(2)(A), because Mr. Martinez concealed assets by transferring the assets to family members, with an intent to hinder and defraud creditors.  The Court agrees with Mr. Siu and finds that Mr. Siu has proven this claim by a preponderance of the evidence.

Century Medallion was Mr. Martinez's sole proprietorship. Blacks Law Dictionary defines a "sole proprietorship" as

> 1. A business in which one person owns all the assets, owes all the liabilities, and operates in his or her personal capacity.  2. Ownership of such a business. — Also termed individual proprietorship.

In California, a sole proprietorship is not a legal entity which is distinct from its individual owner.  Twenty-Nine Palms Enterprises Corp. v. Bardos, 210 Cal. App. 4th 1435, 1449, 149 Cal. Rptr. 3d 52, 64 (Cal. App. 2012), cert. dismissed, 2013 WL 2289882 (U.S. Jun. 25, 2013) (citing Ball v. Steadfast-BLK, 196 Cal. App. 4th 694, 126 Cal. Rptr. 3d 743 (Cal. App. 2011)).  In other words, Mr.

Martinez owned all of the assets -- and owed all of the liabilities -- of Century Medallion. Any transfer of assets by Century Medallion is deemed to have been a transfer of assets by Mr. Martinez.

In the one-year period immediately preceding the filing of Mr. Martinez's bankruptcy petition, Mr. Martinez transferred at least $39,750.00 from Century Medallion to the 7&8 Partnership, operated by Mr. Martinez's children. Mr. Martinez also transferred at least an additional $4,500.00 to his son, Anthony Martinez, in this same, one-year period. However, Mr. Martinez failed to disclose any of these transfers on the Statement of Financial Affairs filed with the petition, and instead affirmatively represented in the Statement of Financial Affairs that no transfers were made. When questioned by the Chapter 7 Trustee at the 341 Meeting of Creditors, Mr. Martinez -- who was under oath -- denied making any transfers of any assets within the previous four years. These representations by Mr. Martinez were false, not only for the above reasons, but also because the evidence shows that in the year 2007, Mr. Martinez also transferred at least $135,081.00 from Century Medallion to the 7&8 Partnership.

Even if the Court were to assume that Mr. Martinez had an obligation to pay rent to the 7&8 Partnership for space used by Mr. Martinez at 15184 Winchester Blvd. to operate his businesses, the amounts disbursed by Century Medallion to the 7&8 Partnership grossly exceeded any rent that might have been due. Apart from the fact that Mr. Martinez's bankruptcy schedules identified no leases, no executory contracts, and no obligations to the 7&8 Partnership, there was some indication in Schedule J that Mr. Martinez's monthly

rent obligation was $2,000.00.[43]  Over a one-year period, the rent would have been $24,000.00 -- not the $39,750.00 paid to the 7&8 Partnership during the one year immediately prior to the petition, and certainly not the $135,081.00 paid to the 7&8 Partnership during 2007.  There was no evidence of any kind to indicate that the funds paid from Century Medallion to the 7&8 Partnership were consideration for any legitimate business transaction.  Instead, the evidence -- which Mr. Martinez did not rebut -- is that these large sums of money were transferred for the benefit of Mr. Martinez's children, without consideration.  See note 13, <u>supra</u>.

The Court is left with the unavoidable conclusion that Mr. Martinez intentionally concealed these transfers in his Statement of Financial Affairs and in his responses -- under oath -- to the questions posed to Mr. Martinez during the Meeting of Creditors. This may explain, somewhat, why Mr. Martinez elected to invoke the Fifth Amendment at trial when Mr. Carroll asked Mr. Martinez questions about Mr. Martinez's transfers of assets to the 7&8 Partnership and to family members.  However, because Mr. Martinez elected not to answer questions put to him on this subject -- including the question of whether Mr. Martinez ever falsely characterized a payment to the 7&8 Partnership as rent -- there has been an ample demonstration, at least by a preponderance of the evidence, of Mr. Martinez's actual intent to hinder and delay creditors from reaching the assets which Mr. Martinez transferred to several members of his family.

---

[43] The profit and loss statement attached to Mr. Martinez's Schedule J stated that Century Medallion's annual rent was $24,000.00.

Mr. Siu has also argued that Mr. Martinez concealed business income in the Statement of Financial Affairs and should be denied a discharge under § 727(a)(4)(A). It is not necessary to reach this argument, because the Court has already concluded that Mr. Martinez must be denied a discharge under § 727(a)(2)(A). However, the Court concludes that Mr. Siu did not demonstrate by a preponderance of the evidence what income should have been reported in the Statement of Financial Affairs, or why the reported numbers were incorrect. Mr. Siu did not call an expert to testify on this subject and instead relied upon Mr. Siu's own interpretations of the financial statements, notwithstanding Mr. Siu's confessed lack of accounting expertise. Mr. Siu relied solely upon deposits into Century Medallion's account, but did not consider any operating expenses which Century Medallion may have had, or which may have reduced any gross income which needed to be included in the Statement of Financial Affairs. Although there was evidence of funds flowing to Century Medallion from the 7&8 Partnership, there was no evidence as to the purpose(s) for such payments. It is thus difficult, if not impossible, to determine whether all or a specific portion of those funds should be characterized, appropriately, as income.

**B. Determination of Nondischargeability Under 11 U.S.C. § 523(a)**

Because the Court has determined that Mr. Martinez must be denied a discharge under 11 U.S.C. § 727(a), Mr. Siu's nondischargeability claims under § 523(a) are moot. See Ng, 494 B.R. at; Rasmussen, 278 B.R. at 806; Everwed Co., 25 B.R. at 764; Taylor, 55 B.R. at 511.

## V. Conclusion

Mr. Siu has established that Mr. Martinez is not entitled to a discharge in Case No. 08-57266-ASW under 11 U.S.C. § 727(a)(2). The nondischargeability claims under § 523(a) are moot, and Mr. Siu has asserted no other causes of action. Each party shall bear his own costs and any attorney's fees incurred during this adversary proceeding.

**IT IS SO ORDERED.**

*** END OF MEMORANDUM DECISION AND ORDER ***

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1                  Court Service List

2  Oscar J. Martinez
   1062 Lucot Way
3  Campbell, CA 95008

4

   Michael Brooks Carroll
5  Law Offices of Michael Brooks Carroll
   300 Montgomery St. #650
6  San Francisco, CA 94104

7

   Mohamed Poonja
8  P.O. Box 1510
   Los Altos, CA 94023-1510
9  (Courtesy Copy)

10

   Office of the U.S. Trustee / SJ
11  U.S. Federal Bldg.
    280 S. 1st St. #268
12  San Jose, CA 95113-3004
    (Courtesy Copy)

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28